UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:03CV484

| | |
|---|---|
| BURL BURNETT, MACEO MAYO, II, CLORINA JAMES and DEIDRE GANTT<br>          Plaintiff,<br><br>v.<br><br>SUBSTANCE ABUSE PREVENTION SERVICES, INC., and THE BOARD OF DIRECTORS OF THE SUBSTANCE ABUSE PREVENTION SERVICES, INC., In Their Official Capacities,<br><br>          Defendant. | MEMORANDUM AND ORDER |

Defendant Substance Abuse Prevention Services, Inc. (SAPS), moves for summary judgment as to all of Plaintiffs' race discrimination and intentional infliction of emotional distress claims, and on its counterclaim for conversion of SAPS funds against Plaintiff Gantt and James. (Doc. No. 71). The action was instituted in the Superior Court of Mecklenburg County, North Carolina and removed to this Court pursuant to 28 U.S.C. § 1331. (Doc. No. 1).

In the fall of 2002, SAPS hired Karen Simon as its Executive Director (ED). Ms. Simon was hired, in part, to institute more professional policies and better supervision over SAPS, including job descriptions and employee evaluations. Between March 27, 2002, and July 26, 2002, the plaintiffs were terminated as a result of their failure to meet the legitimate expectations of SAPS. Plaintiffs now allege that (1) they were treated differently and terminated because of their race; (2) the discrimination was caused by the negligent supervision by SAPS's Board of Directors; and (3) the plaintiffs suffered intentional infliction of emotional distress. (Doc. No. 7). Defendant contends that

1

the employment actions it took against the plaintiffs were because each individual Plaintiff's performance did not meet SAPS's legitimate expectations and that the plaintiffs were not discriminated against because of their race. (Doc. No. 7: Amended Complaint).

ANALYSIS

Summary judgment is appropriate where the Court determines that there is no genuine issue of material fact to be tried and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.P. 56(c). Because an employer's motive "is often the critical issue," the Court "must take special care" when considering a summary judgment motion in an employment discrimination. Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997).

A.    Plaintiffs' First Claim For Relief

All Plaintiffs are seeking legal, equitable, and declaratory relief under 42 U.S.C. § 1981, alleging they were discriminated against when SAPS terminated them because of their race. (Doc. No. 1: Compl. ¶¶ 25-27).

A Section 1981 claim is analyzed in the same manner as if it were a Title VII claim. Causey v. Balog, 162 F.3d 795, 804 (4th Cir. 1998). Therefore, the plaintiffs must proceed under the McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Although the plaintiff's initial burden is not designed to be onerous, in order to make a prima facie case of discrimination, the plaintiff must show by a preponderance of the evidence that he: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was performing his job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action; and (ordinarily) (4) was replaced by a member outside the protected class, or similarly situated employees outside the protected class were treated more favorably. Miles v. Dell,

Inc., 429 F.3d 480 (4th Cir. 2005) (holding that, in certain cases that call for an exception, a plaintiff can show a prima facie Title VII discrimination claim without establishing the fourth prong).

A plaintiff might present positive evaluations, testimony of a superior, and expert testimony to show satisfactory job performance. King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003). An employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 515-16 (4th Cir. 2006).

1. Plaintiff Clorina James

Ms. James has failed to show that her performance met the legitimate expectations of her employer and that she was replaced by someone outside her protected class. Ms. James was SAPS's accountant and was terminated by the Board of Directors on or about March 27, 2003. In 2002, the Board was informed by its auditors of unacceptable accounting practices of Ms. James, including (1) advancing payroll with rubber-stamped signatures; (2) lack of availability during the audit; (3) a side business of income tax preparation; and (4) an inability to post routine adjusting entries. (Doc. No. 75: Daniel TR at 2-3). Upon learning of these practices from the auditors in 2002, the Board came very close to terminating Ms. James. (Id. at 9).

Further problems with Ms. James came to the Board's attention. Ms. James acknowledged that she signed the former executive director's name to checks even though he was no longer associated with the agency (Doc. No. 72: James TR at 13, 83-84), followed poor accounting practices (id. at 73, 100), ignored Ms. Simon's instruction to stop working at home (id. at 31), refused to provide Ms. Simon with a job description after Ms. Simon asked her for one (id. at 54-55), and failed to get Ms. Simon's approval prior to making expenditures. (Id. at 68). Ms. James acknowledged

3

receiving several emails questioning her performance at SAPS. (Id. at 130-32). Ms. Simon's email to Ms. James on February 20, 2003, provides, "Your negligence of your duties continues to create problems. Your performance of your duties does not meet the basic expectations of your position and is unacceptable." (James TR, Ex. 13). Ms. James also acknowledges that she received an email from David Finby, the Board's accountant, regarding his concern over Ms. James's accounting practices. (James TR at 128, Ex. 14).[1]

Accordingly, the contention that her performance was adequate, or that deficiencies were not brought to her attention lacks any probative value. Furthermore, Ms. James can not meet the last element of her prima facie claim since many of Ms. James's duties where given to Ms. Gantt, another African-American. Reading the facts in a light most favorable to her, Ms. James cannot establish a prima facie case of discrimination. Summary judgment, therefore, is proper as a matter of law.

2. Plaintiff Maceo Mayo

Mr. Mayo cannot show that his performance met the legitimate expectations of his employer or that he was replaced by a member outside of his protected class. Mr. Mayo was an SAPS employee for 30 years when the new Executive Director came on board. He was admittedly disappointed when he did not get the job.

Shortly thereafter, SAPS hired an outside consultant, Winona Chestnut, who observed Mr. Mayo's behavior in the office and reported her concerns to the Board of Directors. (Doc. No. 79:

---

[1] Ms. James was convicted of conversion of SAPS's property for purchasing a desk with SAPS's money without permission and failing to return the merchandise. Although Defendant did not have precise knowledge of such criminal activity prior to terminating Ms. James, it nonetheless further demonstrates, albeit superfluously for these purposes, the reasonableness of Mr. Finby's concerns.

4

Chestnut TR, Exs. 1-4). On May 14, 2003, the Personnel Committee (Melissa Holmes and Thelancy Price - both African Americans), Board Chair Mr. Daniel, Karen Simon, and outside consultant Ms. Chestnut met with Mr. Mayo in order to discuss some of their concerns with him. Mr. Mayo was provided a form entitled "Supervisor's Comments." At the meeting, Mr. Mayo admitted to withholding important information from Ms. Simon regarding state training cancellations. (Daniel TR at ¶ 8). Mr. Mayo was given a two week leave of absence with pay and informed that when he returned he would be placed on two months probation. (Id.). He refused to work on probation upon his return. (Id.). The term of Mr. Mayo's probation was that he was going to be supervised more closely. It did not affect any pay or other term of his employment.

Mr. Mayo acknowledged that his supervisor was unhappy with him for withholding information (Doc. No. 76: Mayo TR at 71, 88, 89), that he was advised by Ms. Simon that she did not like him raising his voice at her and felt this behavior was unprofessional (id. at 99), that he refused to work under the condition of probation (id. at 122), that he refused to respond to his performance evaluation (id. at146-147), and that he could have continued to work at SAPS, but he choice not to work under the condition of probation. (Id. at 132).

Mr. Mayo cannot show he was performing his job in a satisfactory manner. In addition, he cannot meet the final element to show a prima facie case. The training responsibilities that previously were Mr. Mayo's were given to two other African-American employees, Joanne Jenkins and Vince Walden. (Simon Dep. p. 110).

3.  Deidre Gantt

Ms. Gant has failed to show that her performance met the legitimate expectations of her employer, and thus has failed to proof a prima facie case of race discrimination. Ms. Deidre Gantt

5

was SAPS's office manager. Winona Chestnut, the outside consultant, observed and reported to the Board that Ms. Gantt was undermining both Ms. Simon and the agency. Ms. Gantt admitted she felt that Ms. Simon was a micro-manager who kept close tabs on all staff members and made sure that Ms. Gantt was at work by 8:00 AM. (Doc. No. 76: Gantt TR at 32-34). Gantt also admitted that Ms. Simon expected professional conduct from all employees at SAPS. (Id. at 39-40).

After the accountant's position was eliminated, Ms. Simon gave Ms. Gantt a raise for her increased accounting responsibilities. (Id. at 45). Ms. Gantt acknowledged that she was warned on numerous occasions about her divisive and uncooperative behavior. In particular, Ms. Gantt attended a meeting at which Russ Daniel, Winona Chestnut, and Karen Simon met with the staff to let them know that Mr. Mayo would no longer be associated with the agency because of his refusal to work on probation. During that meeting Ms. Gantt became upset and began speaking out against Ms. Chestnut and another employee, Joanne Jenkins, who is African-American. (Gantt TR at 81). She acknowledges that she was told on several occasions to stop talking and that she refused to listen. Mr. Daniel felt that Ms. Gantt's attack on Ms. Chestnut and Ms. Jenkins was very inappropriate and told her to stop talking, and she refused. Mr. Daniel eventually told Ms. Gantt that if she would not stop talking out at the meeting, that he would terminate her because of inappropriate behavior. She indicated she would continue to act in the manner regardless of any direction she received from the board or her supervisor. She insisted that she had to be fired before she would leave the premises. Ms. Gantt was then terminated. (Daniel TR at 29). Finally, she admitted that upon her termination, an investigation confirmed that she had committed numerous illegal acts to use agency monies for her own personal interests and benefit. (Gantt Dep. pp. 79, 81).

Ms. Gantt's arguments that she was exercising her right to free speech and that she was

6

terminated because she supported and stood up for African-Americans in public lacks evidentiary support. Ms. Gant, therefore, has failed to show that her performance met the legitimate expectations of her employer, and thus has failed to proof a prima facie case of race discrimination.[2]

4. Plaintiff Burl Burnett

Ms. Burnett cannot set forth evidence to establish a prima facie claim of discrimination as she cannot show that she met the legitimate expectations of her employer. When Ms. Simon was hired, she held staff meetings every Monday, which Ms. Burnett attended. Ms. Burnett acknowledges that Ms. Simon was displeased with her tone of voice and outbursts on several occasions. (Id. at 50-52). Ms. Chestnut also reported to the Board that Ms. Burnett was unprofessional and disrespectful to the new ED. (Chestnut TR at 2; Exh 1).

Because the state was implementing certain changes, Ms. Burnett was going to be required to provide prevention services to children. She was adamant about her dislike of and having to work with children. (Doc. No. 76: Simon TR at 46, 48; Kessler TR at 1, 2). Ms. Burnett also acknowledges that part of the reason she was terminated was because of complaints received from Loree Littlefeather and Hope Marshall from Mecklenburg County Structured Day Program. (Burnett TR at 95-103, Ex. 3, Ex. 6 at 15, 16). Additionally, Ms. Burnett admitted that she missed the classes as outlined by Ms. Marshall. (Id.).

Furthermore, Ms. Simon personally observed and received complaints from other co-workers about Ms. Burnett yelling at other staff members and her inappropriate actions towards a participant.

---

[2] Although it is unnecessary in determining that Ms. Gantt failed to meet her employer's legitimate expectations, the Court notes that after Ms. Gantt was terminated, SAPS determined that she had been stealing SAPS's funds for her own personal use. (Swift Aff.). Ms. Gantt was investigated by the Charlotte Mecklenburg Police and she pled guilty and was convicted of felony conversion on February 14, 2005. She was ordered to pay over $11,000.00 in restitution to SAPS.

(Simon Dep. pp. 89-90). This information was passed to the Personnel Committee and was part of the reason for their decision to terminate Ms. Burnett. Shortly after receiving a copy of Ms. Burnett's letter complaining about race discrimination, SAPS contracted with The Employers Association to investigate the claim. Janet Kessler, from The Employers Association, conducted an investigation on behalf of SAPS. As part of her investigation she interviewed staff members, including Ms. Simon and Ms. Burnett. Ms. Burnett told Ms. Kessler during the interview that she did not like nor want to interact with her co-workers, that she had a distrust of white people, and that she had concerns over working with children. (Kessler Aff; Ex. 1).

Ms. Kessler prepared a report that was presented to the Board, including the Personnel Committee. The report indicated the following:

> Although Ms. Burnett is clearly unhappy with the changes that the organization has faced and will be facing, she has not been treated unfairly or differently because of her race. (Both Ms. Jenkins and Ms. Chestnut, who are African American females, stated unequivocally that race is not an issue within the agency.) Based upon Ms. Burnett's desire to work primarily with adults, as well as her disinterest in working productively with other staff, it may be impossible for her to continue in her current position with SAPS and agency management may be required to replace her with someone willing to meet all criteria of the position. (Kessler Aff.; Ex. 1).

Since Ms. Burnett cannot show that she met the legitimate expectations of her employer, she fails to set forth a prima facie claim of discrimination and, as such, summary judgment is proper.

B.   Second and Third Claim for Relief

The plaintiffs contends that improper supervision by the Board of Directors was a factor in the alleged discrimination against them. (Doc. No. 1: Complaint ¶ ¶ 28-29). Since this Court has found that the plaintiffs were not discriminated against in violation of 42 U.S.C. § 1981, summary judgment is proper on this claim as-well.

The plaintiffs also make a claim for intentional infliction of emotional distress. (Doc. No. 1:

Compl. ¶ ¶ 30-32). However, they do not provide the Court with any factual or legal argument regarding this claim in their complaint or in their response to the motion for summary judgment. As a matter of law, summary judgment must be granted.

## COUNTERCLAIM

SAPS filed a counterclaim for conversion of SAPS's funds against Mayo, James, and Gantt, (Doc. No. 33), which they jointly answered. (Doc. No. 38). SAPS now moves for summary judgment on their counterclaim against James and Gantt,[3] who have failed to file a response. Rule 56(e) of the Federal Rules of Civil Procedure requires a party opposing properly made and supported motions for summary judgment to set forth specific facts to show there is an issue for the trier of fact. James and Gantt have failed to meet their burden as the adverse party. Rule 56(e) states that, "[i]f the adverse party does not respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). In support of their motion for summary judgment, SAPS lists numerous items allegedly converted by James and Gantt respectively and places a dollar value on each. (Doc. No. 77: Swift TR). Additionally, in a state criminal case, Gantt was convicted of felony embezzlement and ordered to pay $11,214.33 in restitution to SAPS (Doc. No. 85: Defendant Ex. A), and James was convicted of misdemeanor conversion. (Doc. No. 85: Defendant Ex. B). Therefore, according to the amounts submitted by SAPS in their motion and supported by the Swift Affidavit, the Court finds that James is liable for damages in the amount $3,632.13, and Gantt is liable for damages in the amount of $9,493.01. SAPS is not entitled to double recovery. Accordingly, any restitution already made in the criminal proceedings shall off-set the judgment in this case.

---

[3] SAPS did not include Mayo in its motion for summary judgment on this counterclaim.

CONCLUSION

**THEREFORE, IT IS HEREBY ORDERED** that the defendant's motion for summary judgment (Doc. No. 71) be **GRANTED,** and that all claims by all the plaintiffs dismissed with prejudice.

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment on its own counterclaim against Plaintiff James and Plaintiff Gantt be **GRANTED**, and Plaintiff James is liable in the amount of $3,632.13 to SAPS and Plaintiff Gantt is liable in the amount of $9,493.01, less any amount paid as restitution in the criminal case.

Signed: September 29, 2006

Robert J. Conrad, Jr.
Chief United States District Judge